Per Curiam::
This case comes before the court on plaintiff’s exceptions to the recommended decision of Trial Judge Harry E. Wood, filed February 20, 1975, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge’s recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision 'as the basis for its judgment in this case. It is, therefore, concluded that plaintiff is not entitled to recover and plaintiff’s petition is dismissed.
OPINION OP TRIAL JUDGE
Wood, Trial Judge:
In this action, plaintiff, a classified
Civil Service employee with over 24 years of service, sues to recover the difference between the salary of the position of Chief, Social Services Branch, grade GrS-13, Housing Assistance Office, Region II (Philadelphia, Pennsylvania), *90 Department of Housing and Urban Development (“HUD”), and that paid to her as a grade GrS-12 employee of HUD for the period commencing January 14, 1969, and extending to the date of judgment herein.
The principal basis for plaintiff’s claim is asserted racial discrimination in the filling of the position of Chief, Social Services Branch. Plaintiff, who is white, contends that HUD officials “pre-selected” a black for the grade GS-13 position, denying her “the procedural guarantees of the merit staffing program”; that the “processing for selection was erroneously conducted * * * to cover up the pre-selection and to discriminate against [plaintiff]”; that there were procedural errors in the agency’s review and processing of plaintiff’s “grievance” ; and that the Civil Service Commission (“CSC”) acted arbitrarily and capriciously in failing to correct erroneous agency action. Defendant vigorously controverts these contentions.
The .relevant facts are detailed at length in the accompanying findings of fact. To restate them in this opinion would serve no useful purpose, and would unduly lengthen a report already unavoidably long. It suffices to say that, as set forth in the ultimate findings and conclusions, the record fails to substantiate plaintiff’s claims of racial discrimination and pre-selection. See, in this connection, Grover v. United States, 200 Ct. Cl. 337 (1973); Haynes v. United States, 190 Ct. Cl. 9, 418 F. 2d 1380 (1969).
Nor does the record show any arbitrary, capricious, or unlawful action by defendant’s officers or employees during the administrative process culminating in the selection of another person for the position of Chief, Social Services Branch. Id. While plaintiff was undeniably well-qualified for that position, and appropriate officials of Begion II, HUD, so found, the determination that she was not “best-qualified” is here impervious to attack. See Hirsch v. United States, 205 Ct. Cl. 256, 499 F. 2d 1248 (1974); Grover v. United States, supra.
Other arguments advanced by plaintiff have carefully been considered. Those arguments, too, are treated in the ultimate findings and conclusions. One aspect of the case, the failure of Mr. Carl L. Barnes, a veterans preference eligible *91 on the CSC Certificate of Eligibles for the position of Chief, Social Services Branch, to receive a telegram from Begion II, HUD, and a purported memorandum of telephone call from Mr. Barnes indicating disinterest in that position, which in fact he did not make, are puzzling and on this record unexplained. There is no proper basis, however, for concluding that these matters confer on plaintiff any right to recover herein, since in any event she suffered no damage thereby.
Plaintiff’s several assertions of error during the administrative hearing on her claim of racial discrimination are for the most part unfounded. The most serious charge, that of an “ex parte excursion” by the Hearing Officer, in violation of HUD regulations, is wholly unaccompanied by any showing of prejudice to plaintiff. Consequently, the administrative hearing process was clearly not fatally flawed by any actions on the part of the Hearing Officer. Grover v. United States, supra; Haynes v. United States, supra.
In short, plaintiff has failed to establish any arbitrary, capricious, or unlawful actions on the part of defendant, either in the process of selection for the position of Chief, Social Services Branch, grade GS-13, Begion II, HUD, or in the administrative considerations of plaintiff’s complaints concerning that selection process. Accordingly, it is concluded that plaintiff is not entitled to recover, and that her petition should be dismissed.
FINDINGS OF FACT
1. (a) Plaintiff, a white classified Civil Service employee with over 24 years of service, sues to recover the difference between the salary of the grade GS-13 position of Chief, Social Services Branch, Housing Assistance Office, Begion II (Philadelphia, Pennsylvania), Department of Housing and Urban Development (“HUD”), and that paid to her as a grade GS-12 employee of HUD for the period commencing January 14, 1969, and extending to the date of judgment herein. Plaintiff contends that HUD officials “preselected” a black for the grade GS-13 position, denying her “the procedural guarantees of the merit staffing program”; that the “processing for selection was erroneously con *92 ducted * * * to cover up the pre-selection and to discriminate against [plaintiff] ”; that there were procedural errors in the 'agency’s review and processing of plaintiff’s “grievance”; and that the Civil Service Commission (“CSC”) acted arbitrarily and capriciously in failing to correct erroneous agency action.
(b) Trial of this cause has been duly limited to the issues of law and fact relating to plaintiff’s right to recover, reserving determination of the amount of recovery, if any, for further proceedings.
2. (a) On May 18,1960, after prior civilian service within the Department of Defense in social services and armed forces recreation and welfare programs at military installations both within and without the United States, plaintiff was employed by the Chicago Eegion, Public Housing Administration (“PHA”) as an Occupancy Specialist, grade GS-9. In April 1961, plaintiff was designated to establish an Office of Community and Social Services within the Chicago Region, PHA, and on October 31, 1961, she was promoted to grade GS-11. Plaintiff was responsible for all phases of the Social Services Program in the Chicago Region.
(b) On October 29, 1962, plaintiff was transferred to the Philadelphia Region, PHA, as a Community Services Officer, grade GS-11. She was promoted to Community Services Officer, grade GS-12, July 3, 1963. In 1965 the functions, powers, and duties of the PHA were transferred to HUD. From October 1962 to March 1969, plaintiff was in charge of the Philadelphia Region Social Services Office (or Branch), and was responsible for the Social Services Program in that region. Her position, during the period 1967-69, was that of Social Services Advisor, grade GS-12, Social Services Office (or Branch), Housing Assistance Office, Region II, HUD.
(c) At the time of trial of this case plaintiff was employed in the Camden, New Jersey, Area Office of HUD, in the position of Community Services Advisor, grade GS-12.
3. During the period here material, Chapter 335, Federal Personnel Manual, “Promotion and Internal Placement”, provided in substance for the installation in an agency by the agency head of a merit promotion plan in order to conform to the requirements of the Federal Merit Promotion Program *93 in tlie filling of vacancies in the career Civil Service. Any such agency merit promotion program was required to provide, among other things, for selection from among the best of the qualified candidates for a position without discrimination among them for any reason such as sex, race, religion, or politics. “Concurrent” consideration of qualified individuals outside an agency who were known to be available, along with employees within the agency, for a particular vacancy was specifically authorized by Chapter 335. Chapter 335 also required the maintenance of clear records; provided that qualification standards and evaluation methods should be reasonable, applied with fairness and equity to all candidates, and designed to obtain the highest practicable degree of validity and reliability under the specific circumstances; and stated that when a promotion action did not conform “to the specified conditions of the governing plan, the employee must be removed from the position * * * unless the violation has been or can be corrected to conform to the conditions of the plan.”
4. During the period here material, A HUD Handbook, 335.1, “Personnel Policy Merit Staffing”, provided in part as follows:
CHAPTER I. HDD MERIT STAFFING POLICT
SECTION 1. INTRODUCTION
1. Statement of Policy. It is the policy of the Department of Housing and Urban Development to fill its positions with the best-qualified candidates. By establishing the HUD Merit Staffing Policy, the Department provides for the systematic selection of candidates to fill positions through promotion, reassignment or recruitment outside the Department. This policy will be administered in accordance with the standards and instructions of the United States Civil Service Commission and the principles and requirements of the Federal Merit Promotion Program. The policy affirms that there shall be no dis-criminations against individuals because of race, color * * *.
$ $ «I»
SECTION 2. ADMINISTRATION OF THE POLICY
*94 5. Responsibility of Primary Personnel Components. The primary personnel components (i.e. * * * the personnel offices in each HUD Eegional Office) are those servicing * * * each Eegional Administrator. They are responsible for conducting personnel operations in conformity with the requirements of the Merit Staffing Policy, and for informing and advising employees regarding it. They are further responsible for maintaining lists of vacancies together with information regarding the qualifications required for eligibility. Vacancy lists and information on qualifications are to be available for review by employees.
6. Responsibility of Supervisors. The active interest and ■involvement of supervisors in the continuing administration of the policy is essential. Supervisors are responsible for working cooperatively with personnel officials in developing ¡realistic qualification standards for groups of positions as well as for individual vacancies; and for providing advice to personnel officials in establishing objective methods for identifying the best-qualified employees on a Department-wide basis.
$ $ $ * «
SECTION 3. BASIC OPERATING PRINCIPLES
if: :f: &
11. Definitions. The policy provides for consideration of all eligible employees of the Department and for their designation as qualified, well-qualified, or best-qualified. To be designated as:
a. Qualified, a candidate must meet the minimum qualification requirements of the position, including any selective qualification factors.
b. Well-qualified, a candidate’s experience, training and potential must exceed the minimum qualification standards and any selective qualification factors specified.
c. Best-Qualified, a candidate’s experience, training, and potential must substantially exceed the minimum qualification standards for the position and any selective qualification factors to a degree that indicates he can meet the requirements of the job in a markedly superior manner.
❖ $ $ $ $
13. Consideration of Outside Candidates. In developing the List of Qualified Candidates, personnel officials should insure that consideration is given to individuals outside the Department. By agreement *95 between the selecting official and the head of the primary personnel component or his designee, the names of qualified candidates from outside the Department, suggested by the selecting official, may be included on the lists of candidates eligible for consideration. If current experience or recruitment effort has demonstrated that better-qualified candidates are not available outside the Department, the head of the personnel component may elect to confine consideration to employees of the Department.
14. Ad Hog BatingPanels. Candidates designated as well-qualified will he screened and rated by an ad hoc panel which will determine those who are best-qualified. * * * the panel will consist of the head of the primary personnel component or his representative and the selecting official. Should the ad hoc panel be unable to come to agreement on those candidates that are to be designated as best-qualified, the appropriate Director of Personnel will make the determination of the candidates to be included.
* * * * *
17. List of Best-Qualified Candidates. Ad hoc rating panels * * * will evaluate available candidates whose names are on the list of well-qualified eligibles, taking into consideration the candidates’ experience, training, education, work performance, awards or special recognition for Federal service, and other pertinent information. In evaluating the candidates listed, the selecting official or personnel official may contact their past and current supervisors to gain further knowledge of their suitability for the vacancy, as evidenced by past performance, leave record, personal characteristics, on-the-job attitude, etc. If the panel members determine that one or more of the well-qualified candidates meet the criteria for Sesi-qualified, they will assign that rating, and record their names on Part II of the Selection List (Best-Qualified Candidates), HUD Form No. 154.
18. Final Selection of Candidates. The selecting official will review the list of the best-qualified candidates developed by the ad hoc rating panel (of which he was a member) and make the final selection. If the list of best-qualified candidates includes the names of candidates from within and from outside the Department, the selecting official is required to make his choice from among the candidates who are employees of the Department.
*****
*96 19. Release of Selected 'Candidate. Upon receipt of the returned Selection List from the selecting official, the appropriate personnel official will arrange for release and entrance-on-duty dates for the employee selected. Normally, the selected employee will be required to be released from his current position two weeks after final selection. However, a maximum of thirty days generally may be permitted when a mutual agreement is reached between the releasing and receiving offices.
5. During the period here material, A HUD Handbook, 713.1, “Personnel Policy Equal Employment Opportunity”, provided in pertinent substance that it was the policy and intent of HUD to provide equality of opportunity in employment for all qualified persons, and to prohibit discrimination because of race or color in all aspects of its personnel policies, programs, practices, and operations. The said Handbook required that Kegion II establish, maintain, and carry out an affirmative action plan designed to promote equal opportunity in every aspect of employment policy and practice, and set forth certain elements to be contained therein as a minimum. One such element was the adoption of measures necessary to insure genuine equality of opportunity for members of minority groups to participate fully on the basis of merit in all organizational units, occupations, and levels of responsibility. The said Handbook also stated that supervisors at all levels had vital responsibilities in the effective implementation of the HUD program of equal opportunity in employment, and that each supervisor was responsible for taking all actions affecting personnel and qualified applicants for employment based solely on merit principles. The said Handbook also provided for the filing of complaints of alleged discrimination, and for their processing. Paragraphs 21 and 22 of the said Handbook provided in part as follows:
21. Rearing.
a. Offer of Hearing. In any case which is not disposed of informally, the processing officer shall advise the complainant in writing of the tentative findings of the processing officer, of the complainant’s right to a 'hearing, and of the importance on his part to indicate within 10 days, and preferably on a form to be provided, whether or not he desires a hearing. * * *
*97 b. Hearing Officer. A hearing officer shall be selected by the processing officer with the approval of the Equal Employment Opportunity Officer and shall be an employee specially selected and trained to conduct hearings. The hearing officer shall not be a person who either investigated the complaint or took or reviewed an action or decision giving rise to the complaint.
c. Prehearing Conference. In arranging for the hearing, the hearing officer shall set up a prehearing conference at which he shall seek to clarify the issues, accept stipulations on facts to which both parties agree, establish schedule for the proceedings, and explain his role in the proceedings.
d. Conduct of Hearing. The hearing officer shall conduct the hearing so as to bring out pertinent facts, including the production of pertinent documents. Rules of evidence shall not be applied strictly, but the hearing officer shall exclude irrelevant or unduly repetitious evidence. Information having a bearing on the complaint or an employment policy or practice relevant to the complaint shall be received in evidence. The complainant, his representative, and the representatives of the Department at the hearing shall be given the opportunity to cross-examine witnesses who appear and testify. Testimony shall be under oath or affirmation.
e. Witnesses.
‡ ‡ ‡ ‡
(2) * * * all witnesses shall be free from restraint, interference, coercion, discrimination, or reprisal in presenting testimony.
* * * * *
22. Fined Decision.
a. The Equal Employment Opportunity Officer shall make the final decision on a complaint processed under this Chapter * * *. The decision shall be in writing and shall resolve the issue of discrimination raised by the complainant. Any required remedial action determined to be necessary or desirable to resolve the issue shall be incorporated in the notice of final decision. Copies of the decision shall be sent to the complainant and his representative * * *.
b. The written notice of decision shall advise the complainant of his right to appeal to the Civil *98 Service Commission if be is not satisfied with the resolution of the complaint. The notice shall also advise bim of the time limit within which an appeal may be filed.
c. A decision by the Equal Employment Opportunity Officer may be reopened and reconsidered by the Secretary, who may affirm, modify, or reverse the decision, request further investigation, or grant a new hearing.
6. Throughout the period here relevant, there was in effect in Eegion II, HUD, an Affirmative Action Plan for equal opportunity, which required that it encourage minority candidates to compete for positions within HUD. Pursuant to the Plan, the Personnel Operations Division made recruiting contacts at predominantly black colleges to encourage seniors to apply for federal employment, and made affirmative efforts to inform the black community of federal employment opportunities. The purpose of the Plan was to assure that persons from minority groups received equal consideration for vacancies in Eegion II.
7. Late in 1967, or early in 1968, following a recommendation of a task force on which Vincent A. Marino, then Assistant Eegional Administrator for Housing Assistance, Eegion II, HUD, served, the Social Services Office became a Branch, and a new position of Chief, Social Services Branch, grade GS-13, was authorized. In accordance with HUD (and Eeg-ion II) policy, a job announcement of the vacancy was not posted on any bulletin board in Eegion II. At least for some time following the reorganization of the Social Services Office, Eegion II was under a hiring freeze. On October 7, 1968, however, Mr. Marino executed a Standard Form 52, Eequest for Personnel Action, reflecting a “VACANCY” for the new grade GS-13 position of Chief, Social Services, and requesting that Personnel “EECEUIT”, with a proposed effective date as soon as possible. The said position was described as a “Standard Benchmark Position.”
8. On July 25, 1968, Miss Thelma Doggett, who was then employed by the Eedevelopment Authority of the City of Philadelphia as Eelocation Manager, mailed to HUD an application for a position. Miss Doggett had graduated from Hampton Institute with a bachelor of science degree, and *99 had received a master’s degree in social work from Columbia University in 1952. She had been continuously employed in social work since 1951, and in her position as Relocation Manager supervised 36 employees, including supervisors and field staff.
9. On August 8,1968, William J. Bennett, Personnel Management Specialist for Region II, acknowledged Miss Dog-gett’s application, but suggested that she resubmit it for a rating under the “Mid-Level Examination”. Mr. Bennett also requested that Miss Doggett advise him of her “grade level” following her rating and notice of eligibility, and stated that he would then be able to give her specific information concerning any positions that might be available.
10. In consequence of Miss Doggett’s submission of her application to the CSC, she was advised by the CSC August 20,1968, that she had been assigned eligibility at grade GrS-13 level. Miss Doggett so advised Mr. Bennett by letter. On August 27, 1968, Mr. Bennett acknowledged receipt of Miss Doggett’s letter, and stated that “This will be attached to your application.” Mr. Bennett also stated that “At the moment we are under a ‘hiring freeze’ and are unable to advise you of possible future vacancies”, but that Miss Doggett would receive every consideration for any vacancy for which she qualified.
11. In September 1968, Myron Bradley, Director, Tenant and Operations Services Division, Housing Assistance Office, Region II, HUD (in which Division the Social Services Branch was organizationally located), and plaintiff’s immediate supervisor, called Miss Doggett to request that she come to his office for an interview. Mr. Bradley interviewed Miss Doggett, at the Regional Office, on September 23,1968. He expressed an interest in Miss Doggett’s background and work experience, particularly as a supervisor, advised her that there was a vacancy in Region II in the position of Chief, Social Services Branch, grade GS-13, and said that he wanted her to meet Mr. Marino, but that Mr. Marino was in conference. While waiting to talk with Mr. Marino, Miss Doggett sat in briefly on an orientation meeting for new interns being conducted by Miss Stephanie Giddings in the Social Services Office. Miss Giddings testified administra *100 tively, in 1970, that she “knew [Miss Doggett] had been selected when she was selected because * * *” Miss Doggett had sat in on the orientation meeting.[1] Miss Doggett was called out of the meeting, while it was still in progress, to meet with Mr. Marino. Mr. Marino told Miss Doggett of the existing vacancy in the Social Services Branch and of the duties of the position, asked her about her background and current employment, indicated to her the kind of person he was looking for, mentioning that he wanted someone with supervisory skills, and asked whether she would be interested in a job in Region II if one became available. Mr. Marino did not make any promises or commitments to Miss Doggett respecting employment then, or at any other time prior to January 14, ■ 1969. He was, however, quite impressed with Miss Doggett’s background and experience, and with her personal characteristics (poise, articulateness, and concern for people) during the interview. At the conclusion of the interview, Miss Dog-gett was told that if anything came up she would hear from Personnel. She understood, however, that she would hear from Personnel one way or the other. She had no further contact with Region II during 1968.
12. On October 7,1968, in response to the S.F. 52 described in finding 7, supra, Mr. Bennett prepared a list of “qualified” candidates for the position of Chief, Social Services Branch, grade OS-13. The list contained the names of four employees of HUD (including plaintiff) and the name of one candidate from outside HUD (Miss Doggett). The “qualified” list indicated that Miss Doggett was an “outside candidate”. Bennett also then prepared a list of “well-qualified” candidates for the said position. The “well-qualified” list contained three of the names on the “qualified” list: those of plaintiff, Miss Doggett, and Raymond Zimmerman, a white.
13. Prior to October 16, 1968, Mr. Zimmerman, already a grade OS-13, had advised Mr. Bennett, in response to Mr. Bennett’s inquiry, that he was not interested in the position of Chief, Social Services Branch. He testified at trial that he had so advised Mr. Bennett because he did not want to be in *101 a position of competing with plaintiff for the position, and if selected to be her supervisor.
14. The “qualified” and “well-qualified” lists Mr. Bennett had prepared were turned over to James A. Quinn, Region II Director of Personnel, and taken by him to Mr. Marino. Upon receiving the lists, Mr. Marino indicated that he desired Mr. Zimmerman for the position. Mr. Quinn told Mr. Marino that Mr. Zimmerman had indicated a lack of interest in the position. Mr. Marino nonetheless talked with Mr. Zimmerman, who reiterated that he did not desire the job.
15. At trial of this cause, Mr. Zimmerman testified that during “this same time frame”, and perhaps in late September or early October 1968, at a meeting at the Central Relocation Bureau (apparently part of the Philadelphia Redevelopment Authority) “someone” said “they heard that HUD was going to get another one of their employees.” Mr. Zimmerman also testified that when he asked whom, “they said Thelma Doggett.” Date in 1968, in the course of a conversation with Mr. Bennett initiated as a result of a call from plaintiff to Mr. Zimmerman, Mr. Zimmerman got the impression that Miss Doggett was “the person for the job”, and Mr. Zimmerman thereupon called plaintiff and told her that Miss Doggett “had the job.”
16. Plaintiff first learned that the position of Chief, Social Services Branch, grade GrS-13, would be filled some time between October 7, 1968, and the end of that month. At the time she was, and for some time had been, serving as the head of the Social Services Office (or Branch). She then had some 20 years’ federal service and extensive experience in the social services field, and was concededly “well-qualified” for that position.
17. Sometime prior to December 20, 1968, while serving in the Social Services Office (or Branch) in grade GS-12, plaintiff had received a within-grade increase. On December 19, 1968, Mr. Bradley, plaintiff’s immediate supervisor, showed her the list of “well-qualified” candidates for the position of Chief, Social Services Branch,’ grade~GS-13. When she questioned Mr. Bradley about Miss Doggett, whose name was also on that list, Mr. Bradley indicated that Miss Doggett was employed by the Philadelphia Relocation Office. *102 la response to plaintiff’s inquiries as to Miss Doggett’s qualifications, Mr. Bradley, in plaintiff’s view, spent some time “justifying” Mias Doggett’s qualifications. Plaintiff’s call to Mr. Zimmerman, described in finding 15, supra, followed this conversation. Shortly thereafter, plaintiff met with Mr. Ma-rino and Mr. Bradley, indicated that she felt the vacancy was not being filled according to regulations, insisted that applicable regulations be followed, and requested that the position not be filled 'until after her return from Christmas leave. Mir. Marino advised plaintiff that the job would not be filled until after her return from leave, and that the proper procedures would be followed in filling it.
18. At some time following October 7,1968, and most probably around January 14,1969, Mr. Quinn placed on the “well-qualified” list, opposite the three names it contained, the remarks set forth below:

Name Remarks

Madeline Hodge- Qualifications Exceed Minimum GS-101-13 Requirements in X-118
Raymond Zimmerman- Not Interested — Declined Consideration
Thelma Doggett- Qualifications Exceed Minimum GS-101-13 Requirements in X-118
19. The Ad Hoc Rating Panel (“the Panel”) to screen and rate “well-qu'alified” candidates for the position of Chief, Social Services Branch (see finding 4, supra) consisted of Mr. Marino and Mr. Quinn. The establishment of the Panel was not formally documented, and it kept no minutes of its deliberations. At a preliminary Panel meeting (probably in December 1968, although precisely when is unclear) Mr. Marino and Mr. Quinn agreed that Mr. Marino would obtain from plaintiff’s supervisors their evaluations of plaintiff, and that Mr. Quinn would obtain from Miss Doggett’s supervisors their evaluations of her.
20. On January 6, 1969, Mr. Quinn obtained hi person from one of Miss Doggett’s supervisors, and by a telephone call to another of her supervisors, evaluations of Miss Dog-gett. He then had his notes of the conversations typed in the form of 'a memorandum to Mr. Marino.
*103 21. On January 10,1969, plaintiff, and her representative, met with Warren Phelan, Regional Administrator, to discuss the filling of the position of Chief, Social Services Branch. Plaintiff conveyed to Mr. Phelan her belief that appropriate procedures were being violated in the filling of that position.
22. On January 13, 1969, Mr. Marino called plaintiff to his office for a formal interview in connection with the vacancy for the position of Chief, Social Services Branch. Mr. Marino discussed with plaintiff her qualifications for the position, and indicated to her the primary personal characteristics he thought essential for the person to be selected for that job. Plaintiff repeated what she had said to Mr. Phelan on January 10, 1969, said that she intended to speak with her Senator about the position, and told Mr. Marino that if the job were not filled according to regulations she would file a complaint.
23. On January 14,1969, Mr. Quinn and Mr. Marino met, in the latter’s office, as the Panel, for the purpose of selecting the best-qualified candidate (or candidates) for the position of Chief, Social Services Branch. Mr. Quinn brought with him to the meeting plaintiff’s official personnel folder, Miss Doggett’s Standard Form 171 (application for federal employment), his memorandum to Mr. Marino concerning Miss Doggett (prepared by Mr. Quinn after talking with two of Miss Doggett’s supervisors), the qualified and well-qualified lists, and a blank best-qualified list.
24. At the said meeting, Mr. Quinn was told by Mr. Marino that the latter had not yet obtained evaluations of plaintiff from her supervisors. In Mr. Quinn’s presence, Mr. Marino (who had himself directly supervised plaintiff at Region II from February 1967 to some time in 1968) then obtained from one of plaintiff’s former direct supervisors his evaluation of plaintiff’s potential for a supervisory position. During Mr. Marino’s temporary absence from his office, Mr. Quinn also spoke by telephone with plaintiff’s direct supervisor to obtain his evaluation of plaintiff’s supervisory potential at that time. Mr. Quinn subsequently informed Mr. Marino of the results of that call. Mr. Marino then gave Mr. Quinn his own evaluation of plaintiff. Mr. Marino had also obtained *104 from another of plaintiff’s supervisors an unfavorable opinion about plaintiff sometime prior to September 1968. While it is not clear that that opinion was alluded to January 14, 1969, the weight of the evidence is that (including Mr. Marino’s evaluation) at least three negative recommendations concerning plaintiff’s possible selection for the position of Chief, Social Services Branch, grade GS-13, were presented to the Panel January 14,1969.
25. After discussing the evaluations of plaintiff and Miss Doggett before the Panel, going through plaintiff’s personnel folder, and reviewing the experience, education, work performance, awards, and supervisory skill or potential of the two “well-qualified” candidates, the Panel members agreed that plaintiff’s name should not be placed on the “best-qualified” list, and that Miss Doggett’s name should be placed on that list. The decisions of the Panel were unanimous. Had there been any disagreement as to placement of candidates to be designated as “best-qualified”, Mr. Quinn would have had the power to make the determination of the candidates to be included on that list.
26. At the conclusion of the January 14,1969 Panel meeting, Miss Doggett’s name was placed on the “best-qualified” list. Plaintiff’s name was not placed thereon. Both Mr. Ma-rino and Mr. Quinn signed the said list, indicating their agreement thereto. Mr. Marino, as selecting official, then selected Miss Doggett for the position of Chief, Social Services Office, grade GS-13. Mr. Quinn then advised Mr. Marino that since Miss Doggett had to be in reach on a CSC Certificate of Eligibles the selection could only be conditional, and endorsed the list “pending being within reach on appropriate CSC eligible list.”
27. Under HUD regulations in effect in January 1969, had plaintiff been placed on the “best-qualified” list (along with Miss Doggett), Mr. Marino, as selecting official, would have been required to select plaintiff, as an employee of the Department, rather than Miss Doggett, who was then “outside” the Department.
28. On January 14, 1969, Mr. Marino was obviously not unaware of his previous relationship with plaintiff. In his view, she was lacking in essential supervisory characteristics. *105 Tihe record does not establish, however, that the unanimous decisions of the Panel on January 14, 1969, were the result of any “pre-selection” of Miss Doggett, that plaintiff was in any way denied fair and proper consideration in the selection process, or that any violation of her procedural or regulatory rights occurred therein. Mr. Quinn, who had not met Miss Doggett prior to January 14, 1969, may well have been unaware of her race on that day. In any event, neither Mr. Quinn’s nor Mr. Marino’s judgments have been shown to have been affected by racial considerations, and those of the Panel have not been shown to have been affected by any improper ones.
29. On January 14, 1969, plaintiff spoke with someone on the staff of Senator Scott, in Washington, D.C., to request information on the filling of the position of Chief, Social Services Branch. During the conversation, she reiterated her belief that the position was not being properly filled. A few days later a member of Senator Scott’s office called plaintiff to say that the position had been filled, and that she had not been selected for it. Plaintiff was not informed of the results of the selection process by anyone in Region II until March 12, 1969, when Mr. Marino told her that Miss Doggett had been selected to fill the position.
30. On January 27, 1969, the Personnel Office, Region II, submitted to the CSC Standard Form 39, Bequest for Certification, for the position of Chief, Social Services Branch, grade GS-13. The said form, in essence a request for a list of persons eligible for a career or career-conditional appointment from the Central Register of the appropriate Civil Service list of eligibles, also contained the request “that Miss Thelma Doggett * * * be certified for the above vacancy.”
31. On February 13, 1969, the CSC issued a Certificate of Eligibles containing six names, with ratings, the first four of which were as follows: *106 Miss Doggett’s name, and the two names below hers on the Certificate, were marked with an asterisk, to indicate “To provide for declinations.” Messrs. Dryden, Barnes, and Bady all had tentative preference. Under then applicable CSC regulations, Eegion II was required to make its selection from among the top three interested available persons on the Certificate of Eligibles. Moreover, in making such a selection, Eegion II could not pass over a veterans preference eligible to select a non-veteran.
*105 Rating
104.0 TP_ Denis A. Dryden
99.0 TP_ Carl L. Barnes
98.0 TP_ Raymond L. Bady
97.0_ Thelma Doggett
*106 32. Following February 13, 1969, Mr. Quinn prepared a Standard Form 13, Telegraphic Message, setting forth the contents of a telegram to be transmitted to Messrs. Dryden, Barnes, and Bady, as follows:
Your name was one of several certified from Civil Service Commission senior level eligible register for consideration for a Chief, Social Services Branch, GS-13 position $14,409 PA in HUD Region II Housing Assistance Office, Philadelphia, Pa. Notify Mr. Quinn Em. 642, Widener Bldg. 1339 Chestnut St., Phila., Pa. 19107 within five days whether you desire to be further considered for this opening.
By letter of February 26, 1969, Mr. Dryden acknowledged receipt of Eegion II’s telegram, but indicated that he did not plan to leave the position he then held. Mr. Bady, during a telephone conversation of February 24, 1969, with Mr. Bennett, declined further consideration because he did not wish to relocate.
33. The Standard Form 13, Telegraphic Message, prepared by Mr. Quinn (finding 32, supra) correctly set forth Mr. Barnes’ home address. The files of the Eegion II Personnel Office contain an unsigned, and unidentified, Stard-ard Form 63, Memorandum of Call, dated February 24,1969, addressed to Mr. Quinn and reflecting that at 10:25 a.m. that day he had been called by “Carl Barnes, Ee: Telegram for Social Services br. position - He does not wish to be considered.” (Emphasis not supplied.) The said memorandum correctly noted Mr. Barnes’ home telephone number. If the telegraphic message was sent to Mr. Barnes, he did not receive it. Nor did Mr. Barnes call Mr. Quinn (or anyone else) to indicate that he did not wish to be considered for the position of Chief, Social Services Branch. Mr. Barnes *107 was unable at trial to explain either his failure to receive the telegraphic message or the memorandum of call described above, and none of the other witnesses cast any real light on the situation. Had Mr. Barnes been advised, in early 1960, that he was being considered for the position of Chief, Social Services Branch, he would have been quite interested in it.
34. On or after February 26, 1969, the CSC Certificate of Eligibles was returned by the Personnel Office, Kegion II, to the CSC with notations thereon that Messrs. Dryden, Barnes, and Bady had declined the position of Chief, Social Services Branch, grade GS-13, and that Miss Doggett had accepted the said position. The Region II Personnel Office also returned with the Certificate Mr. Dryden’s written decimation, the memorandum of Mr. Bady’s declination, and the memorandum of call purporting to reflect Mr. Barnes’ declination.
35. (a) In January 1969, Miss Doggett, who had heard nothing from Region II about her application following her interview with Mr. Bradley (and her meeting with Mr. Ma-rino) in September 1968 (finding 11, supra) called Mr. Quinn to inquire about the status of her application. Mr. Quinn then advised her that he was unable to give her any real information about its status.
(b) In February 1969, because she was under consideration for another position, outside HUD, and had to make a decision, Miss Doggett again spoke with Mr. Quinn about her application. Mr. Quinn then advised her that she was under consideration for the position of Chief, Social Services Branch, that there were three veterans ahead of her on the Certificate of Eligibles, and that a final selection had not yet been made.
(c) In the early part of March 1969, Mr. Quinn called Miss Doggett, at her home, to offer her the position of Chief, Social Services Branch. Miss Doggett then advised Mr. Quinn that she had been offered another job, and wanted some time to think the matter over. Within about a week, Miss Doggett called Mr. Quinn to say that she would accept the position. Because computerization of Region II personnel records was then in process, Mr. Quinn suggested March 23,1969, as the date of her entry on duty.
*108 (d) By letter dated March. 17,1969, to Miss Doggett, Mr. Quinn confirmed her selection for the position of Chief, Social Services Branch, GS-13;, with a scheduled reporting for duty date of March 24, 1969. Miss Doggett reported for work at Region II on that date.
36. By letter dated April 24, 1969, plaintiff filed with the Assistant Secretary for Equal Opportunity, HUD, a formal discrimination complaint under the Department’s Equal Employment Opportunity Program. In essence, plaintiff asserted that in the filling of the position of 'Chief, Social Services Branch, grade GS-13, Miss Doggett, a black, had been given preferential treatment, and that plaintiff, a white, had not been “given equal opportunity or consideration * *
37. By letter dated April 26,1969, plaintiff filed with the Regional Administrator, Region II, HUD, a grievance complaint. In essence, plaintiff asserted a violation of HUD personnel policy Merit Staffing regulations in the filling of the position of Chief, Social Services Branch, grade GS-13, and requested that prompt action be taken to cancel the selection of Miss Doggett and “to filling it in compliance with your own regulations.”
38. On May 5, 1969, the Assistant Secretary for Equal Opportunity, HUD, referred plaintiff’s formal discrimination complaint to the Director, Inspection Division, HUD, for investigation under Part I, Executive Order 11246, and applicable HUD and CSC regulations.
39. At plaintiff’s request, her formal discrimination complaint and her grievance were combined and processed under IIUD’s Equal Employment Opportunity policy and procedures. Following an investigation by Hugh L. Gauntt, Mr. Gauntt prepared a report of investigation, dated October 1,1969, with some 17 exhibits. A copy of the report of investigation was furnished to plaintiff on October 15,1969.
40. To September 8,1969, plaintiff was represented in certain matters related to her employment in Region II by Thomas J. Wing, an officer of Lodge No. 2032, American Federation of Government Employees (“AFGE”), and an employee of Region II. On September 8, 1969, Mr. Wing was promoted to the position of Chief, Operation Engineering Services, Region II. Mr. Wing understood that, after *109 bis promotion to a supervisory position, be could not hold an office in a federal employees’ union. He withdrew as plaintiff’s representative upon bis promotion because be was no longer 'an officer of AFGE Lodge No. 2032.
41. On November 14, 1969, plaintiff waived informal disposition and informal adjustment of her April 24, 1969 formal discrimination complaint, and requested a formal hearing under HUD grievance procedures. On March 20, 1970, Theolius H. Alexander was selected as Hearing Officer. A prebearing conference was scheduled (and held) on April 22,1970.
42. At the April 22, 1970 prehearing conference, it was determined that plaintiff’s discrimination complaint would be considered together with her grievance, and that the alleged violation of Merit Staffing would be combined with the hearing for processing under the Equal Employment Opportunity procedures.
43. Plaintiff’s formal hearing commenced May 12, 1970, and adjourned June 18, 1970. The transcript of testimony, consisting of some 1600 pages, has been received in evidence as a joint exhibit.
44. At the outset of the hearing, plaintiff objected to the Hearing Officer’s ruling that the burden of going forward rested with plaintiff, and that her case was to be presented first.
45. The record of testimony reflects an objection by plaintiff that Mr. Quinn, Agency Eepresentative at the said hearing, had had an opportunity, in advance of the hearing, to discuss plaintiff’s “case” with several witnesses called by plaintiff to testify at the hearing. Prior to doing so, agency representatives had informally talked with the Hearing Officer to ascertain whether there were any prohibitions against communicating with adverse witnesses, and had been advised that the Hearing Officer was unaware of any restrictions upon the agency talking with witnesses for the purpose of preparing its case. No improper agency conduct in interviewing the witnesses has been noted by plaintiff; the objection is to the interviews per se.
46. Mr. Quinn, Agency Eepresentative at the said hearing, testified, over plaintiff’s objection, on June 18,1970. In over *110 ruling plaintiff’s objection, the Hearing Officer iheld that Mr. Quinn might testify “as to the technical aspect of personnel procedure, policy, regulations, including the requirements pertaining to the Merit Staffing and promotion, insofar as such matters relate to the case being heard”, and “as to his role and performance as a member of the Ad Hoc rating panel.” The Hearing Officer noted both his responsibility to gather relevant and factual information and to make a report in the matter. The Hearing Officer also noted that plaintiff had earlier been apprised of Agency intent to call Mr. Quinn, and had not objected thereto.
47. By letter dated September 30,1970, the Hearing Officer transmitted to the Assistant Secretary for Equal Employment, HUD, his report of findings with respect to plaintiff’s “Complaint.” In the said report, some 14 pages long, the Hearing Officer found, inter alia, that there was “no conclusive evidence * * * in either the report of investigation or the hearing record that would substantiate the complainant’s allegation of racial discrimination.” The Hearing Officer also found, in substance, that plaintiff’s contentions in support of her claim of violation of Merit Staffing procedures were without merit. Specifically, (1) plaintiff’s contention of “pre-selection” of Miss Doggett, and “pre-rejection” of plaintiff, was rejected on the absence of “any evidence that would definitively support the contention of pre-selection of Miss Thelma Doggett or pre-rejection of * * *” plaintiff; (2) plaintiff’s contention of undue delay in effectuating the selection contrary to CSC guidelines and Merit Staffing provisions was rejected on the ground that “an analysis of the events that took place renders the so-called delay understandable”, and that, according to advice sought by the Hearing Examiner from the Philadelphia Begion, CSC (in consequence of testimony by plaintiff that, according to the Commission, candidates could not be selected for a position unless they were in reach at the time of such selection), the procedure employed by Begion II in selecting Miss Doggett for the position of Chief, Social Services Branch, was proper and did not constitute a violation of CSC regulations; (3) plaintiff’s contention that the Ad Hoc Bating Panel’s decision was not made on a factual, sufficient, or supportable *111 basis was rejected on tbe ground, in substance, that the Panel’s conclusion that plaintiff’s “supervisory skill and potential were deficient to the extent that in its judgment Miss Hodge could not perform the job in a markedly superior manner” were not unsupported by substantial evidence; (4) plaintiff’s charge of improper retention and use of certain records in her personnel folder was rejected as not “adequately presented or substantiated * * (5) plaintiff’s charge of “evidence of bad faith”, in that Miss Elizabeth Wood had suggested to plaintiff she resign, was rejected on the ground that the suggestion, made after March 24, 1969, had not been shown to have any “relationship to the basic charges * * * of racial discrimination and violation of the merit staffing procedures”; and (6) plaintiff’s charge of bad faith, in that a promise to remove certain material from her personnel file had not been fulfilled, was rejected as contrary to the evidence. The Hearing Officer stated, in connection with plaintiff’s second contention, that had any of the three persons on the Certificate of Eligibles rated higher than Miss Doggett “indicated an interest in the position the tentative selection of Miss Doggett would have had to be reversed or cancelled.”
48. By letter dated December 10, 1970, the Assistant Secretary for Equal Opportunity, HUD, advised plaintiff in part of his “decision, based on facts developed during the investigation and the hearing, that there is no evidence to support the claim that you were discriminated against in your employment on the basis of race.” Plaintiff was advised of her right to appeal to the CSC if not satisfied with that decision.
49. On December 21, 1970, plaintiff, through her representative, a national officer of AFGE, timely appealed the Assistant Secretary’s decision to the Board of Appeals and Review (“BAR”),CSC.
50. By decision dated June 10, 1971, the BAR, CSC, affirmed the Assistant Secretary’s decision. Among other things, the BAR found “insufficient evidence to support the allegation that Miss Doggett was pre-selected for the position or that special efforts were made to fill the position with a black person”, and that “the reasons offered by Mr. Marino *112 for not including [plaintiff] in the ‘best qualified’ group for further consideration for the position in question are reasonable and that no evidence has been produced to support the allegation that race was a factor of consideration.” The Board also found no violation of merit promotion procedures with respect to asserted delay in filling the position of Chief, Social Services Branch. The Board noted that plaintiff’s supervisors agreed generally that she had the technical knowledge and competence to perform adequately, but had indicated that they could not recommend her for the position of Chief, Social Services Branch, because of her inter-personal relationships.
51. That Mr. Barnes received no telegram from HUH Begion II concerning the position of Chief, Social Services Branch, and. that he did not call Mr. Quinn (or anyone else) to indicate lack of interest in that position (finding 33, supra) do not appear in the administrative record.
ULTIMATE KINDINGS AND CONCLUSIONS
52. In broad terms, plaintiff contends (a) that she was unlawfully discriminated against by officials or employees of defendant; (b) that the failure of the Ad Hoc Bating Panel to place her on the “best-qualified” list was unlawful and contrary to regulations; (c) that, had she been placed on that list, her selection (at least in preference to Miss Hoggett) would have been mandatory; (d) that after Miss Hoggett’s “pre-selection”, Begion II went through a “sham program”, pretending to contact eligibles rated higher than Miss Dog-gett, and recording, erroneously, that each of the eligibles had declined the position; and (e) that an “ex parte” procedure during the “administrative review” of plaintiff’s appeal from Begion IPs actions was “highly improper and denied to plaintiff all of her procedural guarantees.” Plaintiff further asserts certain “procedural errors in the record”, each of which will be considered hereinafter (albeit, since many of the asserted errors rest on assumptions of discrimination, “pre-selection”, or plaintiff’s right to placement on the “best-qualified” list, not each separate assertion will be specifically treated herein.)
53. HUD regulations prohibit racial discrimination in personnel actions. However, plaintiff’s contention of discrimina *113 tion by reason of race in the process of selection for the position of Chief, Social Services Branch, and of Miss Doggett’s “pre-selection” for that position, cannot be accepted, on this record. There is no credible proof that any officer or employee of defendant involved in the filling of that position discriminated against plaintiff (or in favor of Miss Doggett) on racial (or any other forbidden) grounds, pre-selected Miss Doggett because she was black, or pre-rejected plaintiff because she was not. In this connection, it is not insignificant that as late as October 1968, some months after plaintiff says the pre-selection of Miss Doggett had already occurred, Region II’s first choice for that position was Mr. Zimmerman, a white.
54. In broad terms, the record fails to establish that any officer or employee of defendant involved in the filling of the position of Chief, Social Services Branch, acted arbitrarily, capriciously, or contrary to law or regulation in the administrative process culminating in the selection of Miss Doggett for that position. No material breach of paragraph 5, HUD Handbook 335.1 (finding 4, supra) pertaining to informing employees regarding Merit Staffing, and following regulations, has been proven, and neither paragraph IT, HUD Handbook 335.1, nor the revelant paragraph of the Federal Personnel Manual, pertaining to referral of candidates to the selecting official, was violated by the placement of a single name on the “best-qualified” list. Considering outside candidates was plainly not unlawful. While plaintiff was undeniably “well-qualified” for the position of Chief, Sodal Services Branch, as the Ad Hoc Rating Panel found, the concomitant Panel determination that plaintiff was not entitled to placement on the “best-qualified” list has not been shown to be erroneous as a matter of law, violative of any of plaintiff’s regulatory rights, arbitrary, capricious, or unsupported by substantial evidence. Thus, the provisions of paragraph 18, HUD Handbook 335.1 (finding 4, supra), giving a Department employee preferential treatment visa-vis an outsider, are wholly irrelevant, insofar as plaintiff is concerned. All else aside, so too are the provisions of the Federal Personnel Manual pertaining to rectification of violations of law, CSC regulations and instructions, and agency *114 policies, guidelines, and promotion plans. Finally, no irregularities respecting interviews have been established.
55. Plaintiff asserts that the Federal Personnel Manual provides that agencies should avoid practices that may lead employees to believe that a person was pre-selected for a job, or that a promotion was based on favoritism. She further contends that Miss Doggett’s pre-selection violated that sound precept, and that of the Affirmative Action Plan as well. As found hereinabove, however, no such pre-selection has been proven. Thus, there is no actionable violation of regulations in this respect. The requirement that supervisors conduct personnel relationships so as to “foster effective teamwork and high morale” furnishes no basis for comfort to plaintiff. While plaintiff’s dissatisfaction with her failure of selection for the position of Chief, Social Services Branch, is not only clear, but understandable, defendant is under no duty to compensate plaintiff by way of money damages because of that dissatisfaction.
56. Mr. Barnes’ failure to receive the telegram Mr. Quinn prepared for him, and the matter of Mr. Barnes’ purported telephone call to Mr. Quinn, are both puzzling and, on this record, unexplained, but this is of no help to plaintiff. Insofar as the record shows, Mr. Barnes has taken no action to assert any rights he might have to the position of Chief, Social Services Branch, and he is not a party to this action. The administrative decision not to move plaintiff to the “best-qualified” 'list of candidates for that position was a permissible one, 'and even assuming irregularities might have prevented Mr. Barnes’ employment as Chief, Social Services Branch, Region II, HUD, there is no proper basis for concluding that this would confer on plaintiff any right to recover the salary of that position in this action, since, in any event, plaintiff suffered no harm thereby.
57. Particularly in view of the nature of the administrative hearing, plaintiff has failed to show that the Hearing Officer’s ruling that the burden of going forward rested with plaintiff represented an abuse of discretion, was arbitrary or capricious, or was prejudicial to her. That government officials “were permitted to interrogate, question and generally cross-examine and pre-indoctrinate plaintiff’s own witnesses, *115 without the knowledge and consent of the Hearing Officer (or of plaintiff)” is not an accurate depiction of the record. While agency representatives did interview witnesses ultimately called administratively by plaintiff, the record fails to reflect any improper agency conduct. The mere interviewing of witnesses in a case by one party thereto clearly does not amount to a denial of a full and fair hearing, nor is it unlawful administrative action denying procedural rights.
58» Plaintiff also contends that an “ex parte excursion” by the Hearing Officer (see finding 47, supra) violates the principles of paragraph 21(d), HUD Plandbook 713.1 (finding 5, supra). The record reflects that, following plaintiff’s testimony concerning information she had received from the CSC that a candidate could not be selected unless within reach at the time of selection, the Hearing Officer stated that if he felt that the testimony had not brought out all of the pertinent facts, he wanted to feel free to contact plaintiff’s source himself. Subsequently, the Hearing Officer did speak with the Philadelphia Regional Office of the CSC, in his words “described the procedure used in this case, as testified to by Mr. Quinn”, asked whether there had been any violation of CSC regulations, and was told that “the procedure used by the Department was proper and did not constitute a violation of the Commission’s regulations.” It is clear from the record, however, that the “ex parte” communication was in no way prejudicial to plaintiff. Indeed, aside from the fact of the communication itself, plaintiff suggests no harm to her. Thus, without condoning the Hearing Officer’s action, it plainly does not amount to a vitiating defect. See Grover v. United States, 200 Ct. Cl. 337, 350 (1973); Haynes v. United States, 190 Ct. Cl. 9, 14-15, 418 F. 2d 1380, 1383-84 (1969). The situation in this case is wholly unlike those before the court in Jarett v. United States, 195 Ct. Cl. 320, 451 F. 2d 623 (1971) and Camero v. United States, 179 Ct. Cl. 520, 375 F. 2d 777 (1967). In this case, there was plainly no impairment of either the impartiality of the Hearing Officer or the fundamental fairness of the administrative proceeding. Grover v. United States, supra. In this connection, it is worthy of passing mention that the Assistant Secretary for Equal Employment Opportunity, not the Hearing *116 Officer, made the final decision on plaintiff’s discrimination complaint, and that the CSC found no basis for overturning that decision on appeal. In any event, in the circumstances of this case to hold that what is 'at worst harmless error should serve as a basis for awarding plaintiff a money judgment for the salary of a position for which she was validly not selected, and in which she has never served, would be an undue and unjustifiable elevation of pure form over substance.
59. Upon a careful consideration of the entire record in this case, plaintiff has failed to establish that in either the process of selection for the position of Chief, Social Services Branch, grade GS-13, Region II, HUD, or in the administrative reviews of plaintiff’s complaints concerning that selection process, defendant’s actions were arbitrary, capricious, unlawful, or unsupported by substantial evidence.
CONCLUSION OF LAW
Upon the foregoing findings of fact, ultimate findings and conclusions, and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

 The weight of the evidence Is that this conclusion was an unjustified one.